Carolyn REERS, in her capacity as Personal Representative of the Estates of Susanne Amore, deceased, and Salvatore Michael Amore, deceased, Kathryn Meyers–Tonucci, Individually and in her capacity as Personal Rep-

resentative of the Estate of Jeanne Meyers Amore, deceased, and George Guertin, in his capacity as Personal Representative of the Estates of Emily Jeanne Amore, deceased, and Michael B. Amore, deceased, Plaintiffs,

v.

DEUTSCHE BAHN AG, a Republic of Germany Corporation, Deutsche Bahn Reise & Touristik AG, a Republic of Germany Corporation, Deutsche Bahn Autozug AG, a Republic of Germany Corporation, Deutsche Bahn Nachtzug AG, a Republic of Germany Corporation, Mr. Volker, an Individual, Accor SA, a Republic of France Corporation, Compagnie Internationale Des Wagons–Lits, a Republic of France Corporation, and ISD–DSG GmbH, a Republic of Germany Corporation, Defendants.

No. 03 Civ. 5360(MGC).

United States District Court, S.D. New York.

June 3, 2004.

Kreindler & Kreindler LLP, New York, NY, By: James Kreindler, Andrew J. Maloney, III, Vincent I. Parrett, Kristina Lingstaedt, for Plaintiffs.

Patton Boggs LLP, Washington, DC, By: Read McCaffrey, Christopher W. Hellmich, for Plaintiffs.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New York, NY, By: Thomas A. Leghorn, Brett Scher, for Defendants Accor S.A. and Compagnie, Internationale des Wagons–Lits.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New York, NY, By: Thomas R. Cherry, Richard Lerner, for Defendants Deutsche Bahn AG, Deutsche Bahn, AutoZug AG, Deutsche Bahn Reise & Touristik AG ("R & T"), and Janz Volker.

## OPINION

CEDARBAUM, District Judge.

Defendants Deutsche Bahn AG ("Deutsche Bahn"), Deutsche Bahn Auto-Zug AG ("AutoZug"), Deutsche Bahn Reise & Touristik AG ("R & T"), Janz Volker, Accor S.A. ("Accor"), and Compagnie Internationale des Wagons–Lits

("CIWLT"), move to dismiss the complaint on various grounds, including sovereign immunity, lack of personal jurisdiction, and *forum non conveniens*. For the following reasons, the motions are granted.

## BACKGROUND

This case arises from the death of five members of the Amore family in a train accident in France. According to the allegations of the complaint, which are accepted as true for the purposes of this motion, the Amores embarked in Paris on an overnight train to Munich on November 6, 2002. The train was operated by the French national railway, Société Nationale Chemins de Fer Francais ("SNCF"), but the railcar to which the Amores were assigned, Railcar 120, was owned and operated by AutoZug, a subsidiary of defendant Deutsche Bahn, the nationally owned rail operator of Germany.

Shortly before two in the morning, the kitchenette of Railcar 120 caught fire. According to plaintiffs, defendant Volker, an employee of defendant R & T and the attendant assigned to Railcar 120 that night, started the fire and, failing to extinguish it, abandoned his post without warning the sleeping passengers in Railcar 120. The complaint further alleges that employees of Accor and CIWLT, who were working in cars adjacent to Railcar 120, failed to timely warn and evacuate the Amores after defendant Volker fled.

The fire quickly raged out of control, blocking the railcar's interior exits and preventing twelve passengers, including the Amores, from escaping. Although the fire was soon detected and the train stopped, rescue workers were unable to enter Railcar 120 because Volker had locked the exterior doors of the railcar from the inside. The passengers trapped inside their individual compartments were unable to break the windows. By the time firefighters arrived and gained access to Railcar 120, the twelve passengers inside were dead.

Plaintiffs, one of whom is suing individually and all of whom are suing as representatives of the estates of the Amore family, filed this wrongful death and survival action against Volker and a number of corporate defendants connected either directly or through their subsidiaries to the operation of the train on which the Amores were traveling in France. Plaintiffs assert claims of negligence, product liability, and breach of implied warranty. Plaintiffs also seek punitive damages.

On December 11, 2003, plaintiffs consented to the dismissal of two corporate defendants, Accor North America and Stinnes Corporation. Plaintiffs have agreed to dismiss Deutsche Bahn Nachzug, a defendant named in the caption and discussed in the complaint, but whom plaintiffs concede does not exist. Plaintiffs have also agreed to dismiss ISD–DSG GmbH, which did not exist at the time of the accident and is in liquidation. The remaining defendants now move to dismiss the complaint.

## DISCUSSION

The Deutsche Bahn defendants move to dismiss based on sovereign immunity, lack of personal jurisdiction, *forum non conveniens*, and the principle of abstention. The Accor defendants move to dismiss the complaint for lack of personal jurisdiction, *forum non conveniens*, and failure to state a claim.

### I. *Sovereign Immunity*

Deutsche Bahn argues that this court has no subject matter jurisdiction over the claims against it, because it is an agency or instrumentality of a foreign sovereign and therefore immune from suit pursuant to

the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1603–10. As previously noted, Deutsche Bahn is the national rail operator of Germany, wholly owned by the German government.

■ The FSIA provides foreign states with immunity from suits in American courts, subject to certain exceptions. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 489, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Section 1603 states that immunity extends not only to political subdivisions, but also to agencies and instrumentalities of a foreign state, defined as:

> [A]ny entity ... (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

28 U.S.C. § 1603(b). Once a defendant makes a prima facie showing that it is an agency or instrumentality of a foreign state, the plaintiff must demonstrate that a statutory exception to immunity applies. *See Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir.1993).

Plaintiffs concede that Deutsche Bahn is an instrumentality of the Republic of Germany. They argue, however, that two of the FSIA's exceptions remove the cloak of immunity from Deutsche Bahn in this case.

The FSIA provides, in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> (1) in which the foreign state has waived its immunity either explicitly or by implication ...; [or]
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States ....

28 U.S.C. § 1605(a).

Plaintiffs argue that Deutsche Bahn waived its immunity pursuant to § 1605(a)(1) when Germany signed the Convention Concerning International Carriage by Rail ("COTIF"), a treaty that regulates litigation arising from railway transportation in signatory countries. Plaintiffs claim, and defendants concede, that each signatory of COTIF, including Germany, has waived its sovereign immunity with respect to damage claims arising from its railway transportation activities in other signatory countries. Each signatory nation has also agreed that personal injury actions arising from railway accidents can be filed only in the country in which the injury occurred. *See* Convention Concerning International Carriage by Rail (May 9, 1980), app. A, art. 52, § 1. Plaintiffs recognize that the United States is not a signatory of this treaty, but argue that this explicit waiver of immunity from suit in signatory countries is an implied waiver of immunity from suit in the United States within the meaning of the FSIA.

■ Plaintiffs' reading of § 1605(a)(1) is too broad. The Second Circuit has stated that the FSIA's implied waiver provision should be construed narrowly, *see Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,* 204 F.3d 384, 391 (2d Cir.2000), and that such waivers should not be found absent a showing of the sovereign defendant's intention to

waive immunity, *see, e.g., Cargill*, 991 F.2d at 1017. Here, Germany's ratification of COTIF constitutes a very narrow waiver of sovereign immunity: signatory nations have not consented to suit in any signatory nation, but only in the courts of the country in which the injury giving rise to the suit occurred. Plaintiffs provide no justification for finding that through such a limited waiver, Germany and its instrumentalities have impliedly waived sovereign immunity for lawsuits arising in nonsignatory jurisdictions and in countries other than the country in which the injury giving rise to the suits occurred.

■ Plaintiffs also contend that this suit falls under § 1605(a)(2), the commercial activities exception to sovereign immunity. Because it is undisputed that the Amores purchased their train tickets in Europe, and that all of the wrongdoing alleged in the complaint occurred in Europe, the only subcategory of the commercial activities exception potentially applicable here is the third, which removes sovereign immunity when an action is based upon "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

The parties do not dispute that Deutsche Bahn's provision of rail transportation in Europe is a commercial activity. The significant question is whether the negligence, product defects, and breach of warranty that allegedly contributed to the fire in Railcar 120—the acts upon which the complaint is predicated—had direct effects in the United States.

In *Martin v. Republic of South Africa*, 836 F.2d 91 (2d Cir.1987), the Second Circuit held that personal injuries suffered by an American abroad as a result of the tortious conduct of a foreign sovereign cannot provide a basis for finding an exception to immunity under § 1605(a)(2), *see id.* at 95. In that case, appellant alleged that he was injured in a car accident in South Africa and was denied timely medical care because he was black. *See id.* at 92. He returned home a quadriplegic, and argued that the pain, suffering, and financial loss that he consequently suffered in the United States were direct effects of South Africa's tortious conduct. But because appellant suffered his injuries and became a quadriplegic in South Africa, the court reasoned that "it cannot be said that the effects of South Africa's acts occurred 'in the United States.'" *Id.* at 94. The court drew on the reasoning of the leading Second Circuit case to parse the meaning of "direct effect in the United States," *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981). *Texas Trading* held that Nigeria's repudiation of contracts with American corporations had a direct effect in the United States because the plaintiffs' financial loss occurred here: the contracts provided for payment in the United States from a New York bank, and the plaintiffs were injured when Nigeria withheld that payment. *See id.* at 312; *see also Martin*, 836 F.2d at 94. The *Texas Trading* court also suggested that cases involving personal injuries sustained by Americans abroad are both analytically distinct from and easier to resolve than contract claims by corporations. The court noted that personal injuries are "undoubtedly ... 'direct' effects," *Texas Trading*, 647 F.2d at 312, and that when an individual is injured overseas, "it is easy to locate the 'effect' outside the United States" *id.* at 312 n. 35.

*Texas Trading* also approved the reasoning of *Harris v. VAO Intourist, Moscow*, 481 F.Supp. 1056 (E.D.N.Y.1979), a wrongful death action arising from the death of an American citizen in a fire in a Moscow hotel. In rejecting the plaintiff's

argument that the commercial activities exception of the FSIA barred the defendants' claim of sovereign immunity, Judge Weinstein wrote:

> Obviously the negligent operation of a hotel in Moscow causing the death of a United States resident has effects in the United States; here it leaves aggrieved relatives in this country. But the precise issue is not whether the fire had any effect here, but whether it had a "direct effect" in the United States within the meaning of the statutory language. Indirect injurious consequences within this country of an out-of-state act are not sufficient contacts to satisfy the "direct effect" requirement of section 1605(a)(2).

*Id.* at 1062. *See also Close v. Am. Airlines*, 587 F.Supp. 1062, 1064–65 (S.D.N.Y. 1984) (holding that an American citizen could not recover for injuries caused abroad by a foreign airline).

Plaintiffs allege that Deutsche Bahn's conduct outside the United States caused the losses suffered here by the Amores' surviving relatives, as well as economic losses to Deutsche Bahn itself resulting from a decline in its United States business following extensive publicity about the accident. But the direct effects of the conduct alleged were the deaths of the Amores in France, and the cases cited above demonstrate that those extraterritorial effects do not provide an exception to Deutsche Bahn's sovereign immunity. Therefore, the claims against Deutsche Bahn are dismissed for lack of subject matter jurisdiction.

## II. *Personal Jurisdiction*

■ Plaintiffs bear the burden of establishing that the court may exercise personal jurisdiction over the remaining defendants. *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986). When, as here, a motion to dismiss for lack of personal jurisdiction is decided before discovery and without an evidentiary hearing, a plaintiff need only make a prima facie showing of personal jurisdiction. *See Distefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir.2001). All pleadings and affidavits are construed in the light most favorable to the plaintiffs, and all doubts are resolved in their favor. *See id.*

■ A federal court sitting in diversity must apply the law of the forum state in determining whether it may exercise personal jurisdiction over an out-of-state defendant. *Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir.1990). If the applicable statute of the forum state allows the court to exercise personal jurisdiction, the court must then determine whether the constitutional standards of due process are met. *Id.*

■ Because this lawsuit does not arise out of any activity by the nonresident defendants within the state of New York, plaintiffs rely on New York's "general jurisdiction" provision, N.Y. C.P.L.R. § 301. Personal jurisdiction over a corporation exists pursuant to § 301 if the corporation is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence in this jurisdiction.'" *Laufer v. Ostrow*, 55 N.Y.2d 305, 309–10, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982) (quoting *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981)). Section 301 jurisdiction, which subjects a nondomiciliary corporation to suits unrelated to its contacts with New York, is appropriate only if the corporation does business in New York "not occasionally or casually, but with a fair measure of permanence and continuity." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985) (quoting *Tauza v. Susque-*

*hanna Coal Co.,* 220 N.Y. 259, 267, 115 N.E. 915 (1917)).

As discussed in greater detail below, plaintiffs fail to make a prima facie showing of personal jurisdiction over AutoZug and R & T. There are also serious questions whether this court can exercise jurisdiction over Accor and CIWLT.

### A. *The Remaining Deutsche Bahn Defendants*

AutoZug and R & T are two German corporations whose principal business is long-distance passenger train travel in Europe. R & T is a wholly owned subsidiary of an entity called DB Personenverkehr, which is itself a wholly owned subsidiary of Deutsche Bahn. AutoZug is a wholly owned subsidiary of R & T. Thus, each subsidiary exists several rungs down the corporate ladder from Deutsche Bahn.

 Plaintiffs have alleged no direct contacts between AutoZug and New York, and only one such contact between R & T and New York. Specifically, plaintiffs allege that R & T contracted directly with U.S. airlines which have operations in New York to develop "rail and fly" packages for U.S. customers. This allegation is insufficient because it does not show that R & T conducted a continuous course of business in New York, or even that R & T solicited or executed these contracts in New York. The existence of contractual relationships with entities that happen to have operations in New York does not establish § 301 jurisdiction, because it does not show extensive conduct directed toward or occurring in New York. *See Mantello v. Hall,* 947 F.Supp. 92, 98 (S.D.N.Y.1996).

Plaintiffs also rely on mere department and agency theories to argue that jurisdiction over these defendants is proper. Each of these is discussed in turn below.

### 1. *AutoZug and R & T as "Mere Departments" of Deutsche Bahn*

 First, plaintiffs contend that these German subsidiaries are "mere departments" of Deutsche Bahn, and accordingly share the jurisdictional contacts of their parent. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120–22 (2d Cir.1984). A corporate entity that is present in New York will be considered a "mere department" of a foreign parent, so as to expose the parent to personal jurisdiction in New York, "only if the foreign parent's control is pervasive enough that the corporate separation is more formal than real." *Palmieri v. Estefan,* 793 F.Supp. 1182, 1187 (S.D.N.Y.1992) (quoting *H. Heller & Co. v. Novacor Chemicals Ltd.,* 726 F.Supp. 49, 54 (S.D.N.Y.1988)). This theory, of course, requires an initial finding that Deutsche Bahn itself is doing business in New York, and plaintiffs offer a number of alternative theories to support such a finding: that Deutsche Bahn itself has numerous direct contacts with New York, that Deutsche Bahn is doing business through other mere departments located in New York, or that Deutsche Bahn is doing business through various New York-based agents.

 There is a serious problem with plaintiffs' attempt to premise personal jurisdiction over the German subsidiaries on Deutsche Bahn's contacts with New York. Deutsche Bahn is immune from suit in the United States. By alleging that these subsidiaries are mere departments of Deutsche Bahn, plaintiffs are alleging that the subsidiaries are not separate corporate entities at all, but rather alter egos of an immune entity. If, as plaintiffs insist, the subsidiaries' independent corporate form is a mere facade, and Deutsche Bahn exerts pervasive control over them, then the entities must share Deutsche Bahn's immunity. *Cf. U.S. Fid. & Guar. Co. v. Braspetro*

*Oil Servs. Co.,* No. 97 Civ. 6124(JGK), 1999 WL 307666, at *11 (S.D.N.Y. May 17, 1999), *aff'd,* 199 F.3d 94, 97 (2d Cir.1999) (finding that the defendant, a corporate subsidiary of a subsidiary of Petrobras, an instrumentality of Brazil, was also an alter ego of Petrobras, and would have been entitled to sovereign immunity under the FSIA except that a statutory exception to immunity applied). To permit plaintiffs to sue AutoZug and R & T in New York would, according to plaintiffs' own allegations, be tantamount to permitting plaintiffs to sue Deutsche Bahn, a foreign sovereign.

Plaintiffs respond that the rule of *Dole Food Co. v. Patrickson,* 538 U.S. 468, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003), mandates a finding that these subsidiaries are not immune under the FSIA. In *Dole,* the Supreme Court held that indirect subsidiaries of a foreign state do not qualify as agencies or instrumentalities under the FSIA, because they do not satisfy the statutory requirement of majority ownership by a foreign state or political subdivision. *See id.* at 474, 123 S.Ct. 1655; *see also* 28 U.S.C. § 1603(b)(2). But according to plaintiffs' own allegations, AutoZug and R & T are *not* subsidiaries indirectly owned by Germany, but "mere departments" of Germany's agency or instrumentality, Deutsche Bahn. *Dole* did not address such allegations. Essentially, plaintiffs ask this court to ignore the corporate form for purposes of the jurisdictional analysis and to defend it rigorously with respect to the FSIA analysis. Plaintiffs cannot have it both ways. The mere department test, as discussed in greater detail below, "requires an examination of economic realities, not formal relationships." *Mayatextil, S.A. v. Liztex U.S.A., Inc.,* No. 92 Civ. 4528(SS), 1995 WL 131774, at *5 (S.D.N.Y. Mar.23, 1995). If AutoZug and R & T are mere departments of Deutsche Bahn, then this court lacks subject matter jurisdiction over the claims against them. If they are separate corporate entities, then plaintiffs cannot attribute Deutsche Bahn's contacts to the subsidiaries for purposes of personal jurisdiction.

**2. *DER/REG and Deutsche Bahn as the Agents of R & T and AutoZug***

Alternatively, plaintiffs contend that AutoZug and R & T are doing business in New York through an agent. "[A] court of New York may assert jurisdiction over a foreign corporation when it affiliates itself with a New York representative entity and that New York representative renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir.2000). So, for example, in the leading New York case on agency jurisdiction, *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967), the Court of Appeals held that New York courts could assert jurisdiction over a British Corporation, Hilton Hotels (U.K.) Ltd., based on the activities of the Hilton Reservation Service, an entity doing business in New York. The New York entity responded to requests for rate quotations from travel agents, confirmed reservations, performed publicity and public relations work, and otherwise generated business for the London corporation. *See id.* at 537, 281 N.Y.S.2d 41, 227 N.E.2d 851. In short, the court found that "the Service does all the business which Hilton (U.K.) could do were it here by its own officials." *Id. See also Wiwa,* 226 F.3d at 95–96 (asserting personal jurisdiction over defendant foreign holding companies based on the activities of their New York Investor Relations Of-

fice, which was fully funded by the defendants, consulted them on major decisions, and whose sole function was to act on their behalf); *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 120–21 (2d Cir.1967) (premising jurisdiction over an Arizona tour operator upon the activities of a New York travel agent that confirmed reservations and performed other services on behalf of operator); *Miller v. Surf Props., Inc.*, 4 N.Y.2d 475, 481, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958) (holding that a travel agency that responded to telephone inquiries, mailed brochures, and accepted deposits for many Florida hotels was not the agent of one of those hotels for the purposes of personal jurisdiction).

Plaintiffs argue that these German subsidiaries of Deutsche Bahn are doing business in New York through what is actually two separate entities: Destination Europe Resources ("DER") and Rail Europe Group ("REG"). REG is based in White Plains, New York. Plaintiffs note that REG advertises itself as the official North American representative of sixty European railways. REG owns DER, a travel wholesaler. Plaintiffs argue that DER/REG functions as the New York agent of AutoZug and R & T through activities it performs on behalf of their corporate ancestor, Deutsche Bahn: Deutsche Bahn holds DER out as its general agent in the United States on its website for international customers; Deutsche Bahn encourages U.S. customers to purchase all their tickets through DER/REG; and Deutsche Bahn generates significant revenue from ticket sales by DER/REG. Although all of these allegations involve the parent corporation, not the subsidiaries, plaintiffs contend that DER/REG's activities are sufficiently significant to the business of the subsidiaries, and that the agency theory of jurisdiction is sufficiently broad, to support a finding of jurisdiction over the subsidiaries.

There are several problems with plaintiffs' argument. Plaintiffs make no allegations sufficient to justify the conflation of two distinct entities—DER and REG. Why plaintiffs choose to combine DER and REG is clear from Deutsche Bahn's website, which was included as an exhibit attached to plaintiffs' opposition papers: DER, the entity that Deutsche Bahn holds out as its general agent in the United States, is located in Rosemont, Illinois. The activities of an Illinois-based organization cannot support a finding that AutoZug and R & T are doing business through an agent in New York. And the activities of REG alone do not support plaintiffs' argument. Plaintiffs concede that REG serves sixty European railways, not Deutsche Bahn and its subsidiaries exclusively. To find that a corporation is doing business in New York through an agent, a plaintiff must show that the agent is "primarily employed by the defendant and not engaged in similar services for other clients." *Wiwa*, 226 F.3d at 95; *see also Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F.Supp.2d 722, 737 (S.D.N.Y.2001); *Miller*, 4 N.Y.2d at 481, 176 N.Y.S.2d 318, 151 N.E.2d 874. Plaintiffs' allegations indicate only that REG is an independent contractor. Deutsche Bahn's use of REG to sell train tickets in the United States is insufficient to support a prima facie determination that Deutsche Bahn or its subsidiaries are doing business in New York. Furthermore, plaintiffs have not offered a single factual allegation that shows that DER/REG performs any activity in New York on behalf of AutoZug and R & T, as opposed to Deutsche Bahn.

Plaintiffs also argue that Deutsche Bahn itself acts as its subsidiaries' agent in New York. Again, the complaint contains no allegations that Deutsche Bahn performs any activity in New York on behalf of its

subsidiaries. Plaintiffs rely far too heavily on language in the case law that suggests that common ownership "gives rise to a valid inference as to the broad scope" of an agency relationship. *Frummer*, 19 N.Y.2d at 537, 281 N.Y.S.2d 41, 227 N.E.2d 851. Taken to its logical extreme, their position would make every parent the agent of each of its subsidiaries for jurisdictional purposes, and vice versa. But plaintiffs must also show that the agent rendered important services on behalf of its principal. This they have failed to do.

Plaintiffs have not made a prima facie showing that this court has personal jurisdiction over AutoZug and R & T.

Since there is no jurisdiction in New York over any of the Deutsche Bahn defendants, it is not necessary to reach their argument that this court should abstain from hearing this case in deference to the legal proceedings ongoing in France.

## B. *Janz Volker*

Defendant Volker also moves to dismiss for lack of personal jurisdiction. Plaintiffs offer no allegations with respect to Volker's contacts with the United States. Therefore, they have failed to make a prima facie showing of personal jurisdiction over Volker.

## C. *The Accor Defendants*

Accor is a corporation organized under the laws of France. It maintains a registered office in Evry, France. It possesses ownership interests in numerous hotel and tourism-related corporations around the world.

CIWLT is a corporation organized under the laws of Belgium. It maintains a registered office in Brussels. CIWLT provides travel-related services throughout continental Europe, focusing on sleeping and dining car services on European trains. Accor has a 99.48% ownership interest in CIWLT.

### 1. *Accor*

Plaintiffs offer two theories to support the exercise of jurisdiction over Accor: first, that Accor itself maintains sufficient contacts with New York to fulfill the "doing business" standard of § 301; and second, that the jurisdictional contacts of Accor Leisure, a "mere department" of Accor that is doing business in New York, are properly attributable to the parent. Each of these theories is considered in turn.

### a) *Accor's Activities in New York*

■ In determining whether a corporation does business in New York with sufficient regularity to make it amenable to personal jurisdiction under § 301, a court should consider whether the corporation maintains offices, bank accounts, or other property in New York; whether employees of the corporation are present in New York; and whether the corporation solicits business in New York. *See Hoffritz*, 763 F.2d at 58. "Solicitation of business alone will not justify a finding of corporate presence in New York with respect to a foreign manufacturer or purveyor of services, but when there are activities of substance in addition to solicitation there is presence and, therefore, jurisdiction." *Laufer*, 55 N.Y.2d at 310, 449 N.Y.S.2d 456, 434 N.E.2d 692 (internal citation omitted); *see also Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043–44 (2d Cir.1990).

■ The plaintiffs cite the following contacts as sufficient to support general jurisdiction over Accor:

(1) Accor owns more than 15 businesses that are registered to conduct business in New York, and its North American subsidiaries accounted for 22% of its revenue in 2002.

(2) Accor maintains a web of internet sites linking its various subsidiary hotels. Through these websites, Accor solicits U.S. businesses (including New York businesses) to join its affiliate program. By placing a link to Accor's website on its website, a member of the affiliate program can receive compensation for every booking that Accor obtains through customers directed to it by an affiliate.

(3) Accor encourages U.S. customers (including New York residents) to join one of its "loyalty programs," through which they can earn credit toward discounts at Accor hotels.

(4) In 1999, Accor announced that it was acquiring Red Roof Inns and Motel 6. As part of this acquisition, it received a commitment from Morgan Stanley Real Estate Fund LP to tender its 68.3% stake in those hotel chains. The Morgan Stanley Real Estate Fund is owned by Morgan Stanley Group, Inc., a Delaware company whose principal office is located in New York City.

(5) Accor hired a New York law firm, Proskauer Rose LLP, to perform the legal work necessary to complete these acquisitions, and hired New York-based J.P. Morgan & Company to provide financial advice.

(6) Accor formed a joint venture with a New York venture capital firm, the Blackstone Group, to acquire 52 hotels from Vivendi.

(7) Accor owns two bank accounts in New York.

(8) Accor stock can be purchased in New York on the over-the-counter exchange. The Bank of New York trades Accor's American Depository Receipts, and Merrill Lynch trades Accor's ordinary shares. Between 11% and 16.7% of Accor's equity shares have been held by U.S. institutional or individual investors at various times.

(9) Accor conducted thirty "roadshows" in Europe and the United States in 2002 to promote its equity offerings to potential investors, "presumably" with the assistance of one of its New York-based market makers.

(10) Accor authorized a subsidiary, Accor Economy Lodging Inc., which is registered to do business in New York, to file a Form D with the Securities and Exchange Commission ("SEC") regarding a stock issuance.

(11) Accor retained the services of three New York-based investment banks to manage a $680 million bond offering in 2001.

(12) Accor maintains strategic partnerships with U.S. companies, such as Delta Airlines. New York residents who are members of Delta's SkyMiles program can earn credit toward discounts on goods and services through stays in Accor hotels.

(13) Accor has two partnerships with New York-based American Express Company, which involve jointly branded charge cards and a "points" program.

(14) American Express has also owned as much as one percent of Accor stock, making it at one time Accor's fifth largest shareholder.

(15) Accor's worldwide internet reservation system generates revenue from New York residents who make reservations for stays at Accor hotels, as well as from non-New York residents who reserve rooms at New York hotels owned by subsidiaries of Accor.

(16) Accor owns 50% of Carlson WagonLit Travel, a travel agency with offices in New York.

These are isolated and scattershot contacts, not the substantial, continuous, and permanent contacts required to support § 301 jurisdiction. Most of them also suffer from other serious deficiencies.

■ Plaintiffs attempt to blur the line between Accor's contacts with the United States and its contacts with the State of New York. Because this is a diversity suit, it is defendant's contacts with the forum state, not with the United States as a whole, that are relevant to the personal jurisdiction inquiry. Conduct directed toward the United States (or, in the case of some of these purported activities, toward the world generally), cannot subject a defendant to personal jurisdiction in a particular state. Accordingly, while New York residents can benefit from Accor's affiliate program, loyalty programs, internet reservation system, and partnership with Delta Airlines, those benefits do not result from Accor's having reached into New York to solicit business here, but from the fact that access to these programs is available to anyone in the United States who seeks them out. *See, e.g., Drucker Cornell v. Assicurazioni Generali S.p.A.,* Nos. 97 Civ. 2262(MBM), 98 Civ. 9186(MBM), 2000 WL 284222, at *2 (S.D.N.Y. Mar. 16, 2000) (finding that the exercise of personal jurisdiction on the basis of a website available worldwide, without an allegation that the website was purposefully directed toward New York, would offend due process). Plaintiffs cannot cure this deficiency by tacking on a reference to New York residents, as they do in several of the allegations summarized above, because it is clear that the thrust of Accor's activity is not directed toward New York.

Other allegations similarly lack a New York focus. Plaintiffs do not allege that any of Accor's thirty roadshows were conducted in New York, or that any of the owners of Accor securities are New York residents or entities. Plaintiffs do not allege that Accor Lodging filed forms with the SEC on Accor's behalf in New York. And plaintiffs do not allege that Accor retained the services of New York investment banks or law firms for bond offerings or corporate acquisitions in New York. *See PaineWebber Inc. v. Westgate Group, Inc.,* 748 F.Supp. 115, 120 (S.D.N.Y.1990) (finding a corporation's retention of New York law firm to provide services outside of New York to be insufficient to confer jurisdiction).

■ Plaintiffs' allegations that focus more directly on New York suffer from problems as well. The mere fact that Accor owns or partially owns businesses that are registered to do business in New York does not subject Accor to general jurisdiction in New York. *See Ontel Prods., Inc. v. Project Strategies Corp.,* 899 F.Supp. 1144, 1148 (S.D.N.Y.1995) ("In New York, the individual who owns a corporation is generally not subject to personal jurisdiction as a result of the corporation's activities unless (1) the corporate veil can be 'pierced' or (2) the corporation acted as an agent for the owner."). Neither is jurisdiction proper merely because Accor operates websites through which New York residents can make hotel reservations or purchase other services. *See Rodriguez v. Circus Circus Casinos, Inc.,* No. 00 Civ. 6559(GEL), 2001 WL 21244, at *2 (S.D.N.Y. Jan.9, 2001) (finding no general jurisdiction over foreign corporation based on website accessible to New York residents); *Drucker Cornell,* 2000 WL 284222, at *2.

■ Several of plaintiffs' allegations depend on Accor's having done business with entities that are based in New York. None of these allegations, however, indicates whether Accor solicited its partners' participation in New York or whether any of the business was conducted in New York. "The mere existence of a business relationship with entities within the forum state is insufficient to establish 'presence.'" *Mantello,* 947 F.Supp. at 98 (quoting *Insurance Co. of Pennsylvania v.*

*Centaur Insurance Co.,* 590 F.Supp. 1187, 1189 (S.D.N.Y.1984)). Accordingly, Accor's· acquisition of hotels from a subsidiary of the Morgan Stanley Group, its joint venture with the Blackstone Group, and its partnerships with Delta Airlines and American Express do not support an exercise of personal jurisdiction absent allegations of purposeful conduct in New York.

 Although Accor's ownership of two bank accounts located in New York is one factor relevant to the jurisdictional inquiry, bank accounts standing alone cannot create jurisdiction unless they are used for "substantially all" of Accor's business. *See United Rope Distribs. v. Kimberly Line,* 785 F.Supp. 446, 450 (S.D.N.Y.1992). Plaintiffs do not make such a claim. Similarly, the fact that Accor's stock may be purchased in New York, and that Accor retains New York-based market makers to assist in its sales of stock, is another important factor but is insufficient to confer general jurisdiction. *See In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000,* 230 F.Supp.2d 376, 383 (S.D.N.Y.2002).

There is a serious question whether plaintiffs have demonstrated that Accor solicits substantial amounts of business in New York. It is also not clear whether the other contacts which actually involve conduct in New York, such as the maintenance of bank accounts and the sale of securities, constitute additional "activities of substance" sufficient to justify jurisdiction. *Laufer,* 55 N.Y.2d at 310, 449 N.Y.S.2d 456, 434 N.E.2d 692.

b) *Accor Leisure as Accor's "Mere De-partment"*

 Alternatively, plaintiffs contend that personal jurisdiction over Accor is proper because Accor's "mere department," Accor Leisure, is present and doing business in New York. The Second Circuit has outlined four factors to aid in deter-mining whether one entity is the mere department of another: (1) common ownership; (2) financial dependency of the subsidiary on the parent; (3) the degree to which the parent interferes in the selection of the subsidiary's executive personnel and fails to observe corporate formalities; and (4) the extent of the parent's control over the subsidiary's marketing and operational policies. *Beech Aircraft,* 751 F.2d at 120–22; *Aboud v. Rapid Rentals,* No. 97 Civ. 1742(MGC), 1998 WL 132790, at *1 (Mar. 24, 1998). The first factor, common ownership, is "essential to the assertion of jurisdiction over a foreign related corporation," while the other three factors are "important." *Beech Aircraft,* 751 F.2d at 120. "The overall weighing of the various factors thus necessitates a balancing process, and not every factor need weigh entirely in the plaintiffs' favor." *Aboud,* 1998 WL 132790, at *1 (quoting *Mayatextil,* 1995 WL 131774, at *5) (citations omitted). However, the analysis requires more than an identity of ownership. A parent cannot assume the jurisdictional status of its subsidiary unless factors beyond common ownership suggest that their separate corporate identities are a mere facade. *See, e.g., Palmieri,* 793 F.Supp. at 1188–89 (citing cases applying the four factors).

 According to plaintiffs, all of Accor's subsidiaries are mere departments of Accor, and the following allegations demonstrate that Accor Leisure, in particular, is a mere department of Accor. Accor owns 90% or more of Accor Leisure. Accor sets the financial guidelines for all of its subsidiaries. Specifically, Accor implements cost reduction plans, controls bond offerings, manages financial risks, develops operating budgets, approves capital expenditures, and handles insurance coverage. Accor also interferes with personnel assignments by appointing the heads of its subsidiaries. Accor directs

that all of its subsidiaries use a uniform logo that incorporates the Accor name. Accor has also centralized employee recruitment for all of its subsidiaries and developed training programs. Accor has centralized its corporate sales departments, developed a groupwide employee incentive program, and formulated a worldwide environmental policy and hotel risk prevention committee. Accor also controls collective bargaining for all of its European hotels. Finally, Accor's technology links the reservation systems of all of its subsidiaries.

It is a close question whether these allegations constitute a prima facie showing of jurisdiction over Accor in New York. Aside from common ownership, plaintiffs make only one factual allegation specifically about Accor Leisure: that the parent selected the executive in charge of Accor Leisure. The rest of plaintiffs' allegations refer generally to all of Accor's subsidiaries, to the activities of other of Accor's North American subsidiaries, or to subsidiaries in other parts of the world.

Even if plaintiffs could show that their generalized allegations about Accor's dealings with its subsidiaries apply with equal weight to Accor Leisure, it is not clear that those allegations demonstrate the pervasive control required to justify jurisdictional veil piercing. Most courts have held that the financial dependency prong of the *Beech Aircraft* test requires not merely that the parent have some control over the finances of the subsidiary, but that the subsidiary would not be able to function without the financial support of the parent. *See Meteoro Amusement Corp. v. Six Flags*, 267 F.Supp.2d 263, 271 (N.D.N.Y. 2003); *Dorfman v. Marriott Int'l Hotels, Inc.*, No. 99. Civ. 10496(CSH), 2002 WL 14363, at *8 n. 12 (S.D.N.Y. Jan.03, 2002) (noting that when assessing financial dependency, courts typically consider "whether the two companies' accounts have been intermingled, the parent has paid the subsidiary's expenses, the parent has loaned money to the subsidiary without interest, or the parent has guaranteed the subsidiary's obligations"). While plaintiffs have alleged facts indicating that Accor has some measure of control over the broad financial policies of its subsidiaries, they have not clearly alleged dependency.

██ Similarly, control over personnel decisions requires more than the parent's appointment of a few of the subsidiary's officers or directors. *See Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir.1998) (affirming district court's determination that the fact that one of Nissan Japan's four managing directors was also the chairman of Nissan U.S.A. was insufficient to show that the latter was a mere department of the former). Management personnel of two related corporations usually must be "substantially the same" or demonstrate "mirror image symmetry" for this factor to contribute to a finding that a subsidiary is a mere department of a parent. *See, e.g., Self Intern. (HK) Ltd. v. La Salle National Bank*, No. 01 CV 4291(RCC), 2002 WL 500372, at *3 (S.D.N.Y. Mar.29, 2002) (citing cases). Plaintiffs only allege that Accor named the head of Accor Leisure, which is not an extraordinary act within the context of the parent-subsidiary relationship.

██ With respect to marketing policies, the fact that subsidiaries share a logo, or that the parent decides to present several corporations on a website in a unified fashion, is insufficient to show lack of formal separation between two entities. *See J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F.Supp.2d 544, 550 (S.D.N.Y.2001) (finding a failure to distinguish between parent and subsidiary on website insufficient to indicate lack of formal separation:

"[a]n advertising strategy deciding not to present to its consumers the existence of a parent-subsidiary relationship is not equivalent to a showing that the parent corporation exercises any control over its subsidiary's operational or marketing activities"). Finally, it is not clear whether plaintiffs' allegations with respect to Accor's employment, environmental, risk prevention, and other policymaking show anything more than the ordinary control that parent corporations exert over their subsidiaries. It is true that a parent's imposition of operational policies upon its subsidiaries can, in some instances, provide evidence of pervasive control. *See, e.g., Dorfman,* 2002 WL 14363, at *9. However, plaintiffs have not alleged that Accor interferes in the day-to-day operations of Accor Leisure, or that it has exerted control over the standard operating procedures of its subsidiaries. The policies plaintiffs describe are not central or essential to the way in which Accor's subsidiaries conduct their business. "[U]nder New York law a parent of a multinational corporate enterprise may make broad policy decisions for its subsidiaries. Such control is inherent in the parent-subsidiary relationship and does not justify labeling a subsidiary a 'mere department' of the parent." *Saraceno v. S.C. Johnson & Son, Inc.,* 83 F.R.D. 65, 71 (S.D.N.Y.1979).

Plaintiffs have proffered evidence that Accor exercises the kind of control over its subsidiaries typical in any parent-subsidiary relationship. Whether they have alleged the kind of extraordinary control that would justify a finding that Accor Leisure is a mere department of Accor is questionable.

### 2. *Compagnie Internationale des Wagons–Lits*

Jurisdiction over CIWLT depends on a determination that this court has personal jurisdiction over its parent, Accor, and then on a determination that CIWLT is a mere department of Accor and should share the jurisdictional contacts of its parent.

As discussed above, a serious question exists as to whether plaintiffs have made a prima facie showing of personal jurisdiction over Accor. Accordingly, it is not clear that this court has personal jurisdiction over CIWLT. Although discovery limited to the jurisdictional question would ordinarily be in order in this situation, defendants' motion to dismiss can be granted on the alternative ground that New York is an inconvenient forum for this litigation, as discussed below.

### III. *Forum Non Conveniens*

The Accor defendants contend that New York is a manifestly inconvenient forum for this litigation. "The 'central purpose' of *forum non conveniens* analysis is to determine whether a trial will be most convenient and will serve the interest of justice." *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 872 F.Supp. 52, 61 (S.D.N.Y.1994). The analysis proceeds according to the test set forth in the leading Supreme Court case on *forum non conveniens, Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Starting with the proposition that the "plaintiff's choice of forum should rarely be disturbed," *id.* at 508, 67 S.Ct. 839, the defendant must show that an adequate alternative forum exists, *see Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Only if defendant meets that threshold requirement should the court proceed to the private and public interest factors set forth in *Gilbert. See id.; see also Carey v. Bayerische Hypound Vereinsbank AG,* 370 F.3d 234, at 237, No. 03–7819, 2004 WL 1194391, at *2 (2d Cir. June 1, 2004).

## A. France as an Adequate Alternative Forum

 Generally, the alternative forum a defendant proposes is adequate as long as the defendant is amenable to process there and the forum permits litigation of the subject matter of the suit. *See id.* at 254 n. 22, 102 S.Ct. 252. It is undisputed that all the corporate defendants are amenable to suit in France. Accor is a French corporation, and CIWLT concedes that it is subject to jurisdiction in France based on regularly conducted business activities. Deutsche Bahn has a treaty obligation to submit to jurisdiction in France.

Plaintiffs contend that France is not an adequate forum because the remedy French courts would provide to them is unsatisfactory. Plaintiffs offer the declaration of Alain Behr, a French attorney, who states that the maximum compensation that would be available to each estate in a French court would be approximately $100,000. Plaintiffs argue that such a remedy is clearly inadequate, given the terrible circumstances of the Amores' deaths and the seriousness of the misconduct alleged.

Plaintiffs are correct that "in rare circumstances ... where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." *Id.* But *Piper* is clear that an "unsatisfactory remedy," in this context, means no remedy at all. The *Piper* Court was concerned about situations in which the alternative forum does not recognize a plaintiff's cause of action, refuses to permit litigation of the subject matter of the suit, or is otherwise seriously flawed. *See id.* at 254 & n. 22, 102 S.Ct. 252. Accordingly, the *Piper* Court found that Scotland was an adequate forum in a case involving a plane crash in that country: "Although the relatives of the decedents may not be able to rely on a strict

liability theory, and *although their potential damages award may be smaller,* there is no danger that they will be deprived of any remedy or treated unfairly." *Id.* at 255, 102 S.Ct. 252 (emphasis added). *See also Alcoa S.S. Co. v. M/V Nordic Regent,* 654 F.2d 147, 159 (2d Cir.1980) (*en banc*) ("It is abundantly clear ... that the prospect of a lesser recovery does not justify refusing to dismiss on the ground of *forum non conveniens.*"); *Varnelo v. Eastwind Transport Ltd.,* No. 02 Civ.2084(KMW), 2003 WL 230741, at *17 (S.D.N.Y. Feb.3, 2003).

 Because defendants are subject to the jurisdiction of the French courts and those courts will hear plaintiffs' claims, defendants have shown that France is an adequate alternative forum.

## B. Public Interest Factors

 The *Gilbert* public interest factors include (1) the administrative difficulties arising from congested courts; (2) the imposition of jury duty on members of a community unconnected to the litigation; (3) a forum's interest in adjudicating local controversies; and (4) the potential difficulties arising from the application of foreign law. *See Gilbert,* 330 U.S. at 508–09, 67 S.Ct. 839.

The second and third factors weigh heavily in favor of France. It is important to remember that the Amores booked their tickets in France, on a train owned and operated by SNCF, the state-owned railway of France. The complaint alleges tortious conduct on the part of Accor and CIWLT that occurred wholly in France. The complaint alleges wrongdoing by corporations that provide rail services in France and other parts of Europe jointly with SNCF. France has an extremely strong interest in ensuring that its own trains operate safely and that its partners

and affiliates properly maintain and equip their trains and train their employees. France's active interest in these matters is evident both from the criminal investigation into the accident that is pending in Nancy, France, and from France's participation in COTIF, which provides for the uniform regulation of train litigation in signatory countries. Unlike *Wiwa*, this is not a case in which the interests of the American and alternative forum are in equipoise. *See Wiwa*, 226 F.3d 88, 97. Nor have plaintiffs alleged that the United States has a specific interest in the litigation of this suit in an American court, such as the enforcement of U.S. laws, *see, e.g. DiRienzo v. Philip Services Corp.*, 294 F.3d 21, 32–33 (2d Cir.2002), or the adjudication of an accident involving a large number of American citizens, *see, e.g., Ski Train Fire at Kaprun*, 230 F.Supp.2d at 391 (noting that the accident in question occurred during a vacation marketed to members of the U.S. military and their families). The United States' general interest in protecting its citizens from harm while they travel abroad is tenuous in comparison to France's concrete, immediate interest in safe train travel within its borders.

Furthermore, to ask residents of the Southern District of New York to hear what would clearly be a lengthy and complex trial, involving Connecticut residents harmed by activities that occurred entirely in Europe, would be a significant burden.

The first and fourth factors add little weight to the analysis. As plaintiffs point out, the Second Circuit has concluded that the first factor has little or no applicability in this district because of the recent filling of judicial vacancies. *See Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 n. 5 (2d Cir.2000). Likewise, while it is likely that French law applies to this dispute, defendants have not indicated any

particular conflicts or difficulties likely to arise from the application of foreign law. *Cf. Manu Int'l. S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 68 (2d Cir.1981) ("[W]e must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform.").

Because France's interest in this lawsuit is so strong, and because the imposition of jury duty on residents of the Southern District would be a significant burden, the *Gilbert* public interest factors weigh heavily in favor of France as the appropriate site for this litigation.

## C. *Private Interest Factors*

■ *Gilbert's* private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839. Within the last factor, courts frequently consider the financial hardship that each party would experience as a result of litigation in a distant forum. *See, e.g., Wiwa*, 226 F.3d at 107.

Weighing heavily in favor of litigation in France is the fact that plaintiffs are unable to proceed against the Deutsche Bahn defendants in this court, and Accor and CIWLT will be unable to implead these parties. "The inability to implead other parties directly involved in the controversy is a factor which weighs against the retention of jurisdiction in the Southern District of New York." *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 453 (2d Cir.1975); *see also Piper*, 454 U.S. at 259, 102 S.Ct. 252. To require the Accor defendants to litigate here seems an especially perverse result

given that, according to the allegations of the complaint, the unavailable parties are the ones more directly responsible for the accident. Accor and CIWLT are being sued because their employees, working in cars adjacent to Railcar 120, failed to timely warn and evacuate the Amores after defendant Volker fled. It would be unfair, and a significant burden, to require Accor and CIWLT to litigate here without the opportunity to implead equally or more culpable parties. Accor and CIWLT will also have difficulty impleading SNCF, which would have a strong defense of sovereign immunity in this forum. *See Abrams v. Societe Nationale des Chemins de Fer Francais*, 332 F.3d 173, 179–80 (2d Cir.2003). By contrast, all of these parties are subject to the jurisdiction of the French courts.

It is also worth noting that bifurcating the suit, permitting plaintiffs to litigate against some of the defendants in New York, and requiring them to seek relief against others in Europe, would be as inconvenient for plaintiffs as for defendants. Litigation in France would therefore be more convenient for all parties.

The location of the evidence in this case also weighs in favor of France as the appropriate forum. Plaintiffs' arguments with respect to the location of evidence and witnesses depend heavily on their contention that the French court conducting a criminal investigation into the accident will soon rule on the culpability of the defendants, and defendants will be collaterally estopped from contesting liability in this action. Accordingly, plaintiffs argue that this court should undertake the *forum non conveniens* analysis as though this were a damages-only case, excluding from consideration access to evidence and witnesses

that are relevant only to liability. But plaintiffs have presented no records from the French proceedings or affidavits from parties involved that demonstrate that Accor and CIWLT are involved in the French investigation or that the investigation is as wide-ranging in its examination of wrongdoing as the complaint. For these reasons, the *res judicata* effect of any French ruling is not certain, and it would be inappropriate to foreclose consideration of issues of convenience related to liability.

Looking at the full range of proof likely to be introduced in this case, what is most striking is that not a single fact witness or piece of documentary evidence relevant to the complaint's allegations of tortious conduct is located in the United States. Instead, all of the documents, witnesses, and physical evidence that defendants will require to defend this action are located in France, Belgium, or Germany. The breadth of plaintiffs' complaint, which sounds in negligence, product liability, and breach of warranty, and seeks punitive as well as compensatory damages, ensures that the factual evidence presented in this case will be extensive. Plaintiffs respond by pointing out that their damages evidence is located in the United States, which should cancel out any weight to be accorded to the location of defendants' evidence. But plaintiffs allude to this evidence in conclusory terms, and do not explain what it consists of or how it approaches in magnitude the evidence that defendants promise to present.[1] To the extent that it consists of expert testimony, it is entitled to little weight in the *forum non conveniens* analysis. *See Brown v. Dow Corning Corp.*, No. 93 Civ. 5510(AGS), 1996 WL 257614, at *2 (S.D.N.Y. May 15, 1996).

---

**1.** Furthermore, plaintiffs appear to be focusing on damages relevant to their wrongful death claims. By contrast, evidence of decedents' conscious pain and suffering is located in France, particularly in materials generated in the French criminal investigation.

Plaintiffs also argue that defendants are large corporations that can afford the expense of transferring all of their evidence to a foreign tribunal. While courts do appear to be less sympathetic to defendants' claims that litigation in a distant forum will be prohibitively expensive when those defendants are corporations with "vast resources," *Wiwa*, 226 F.3d 88 at 107, defendants' financial resources cannot be a determinative factor in the *forum non conveniens* analysis. "If central emphasis were placed on any one factor, the *forum non conveniens* doctrine would lose much of the very flexibility that makes it so valuable." *Piper*, 454 U.S. at 249–50, 102 S.Ct. 252. The fact that defendants are corporations does not automatically mean that they should bear the significant costs of transporting every document, every piece of physical evidence (which would likely include the train car in question), and every witness relevant to the factual issues in dispute in this case. *See Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 611 (2d Cir.1998) (affirming district court's dismissal on *forum non conveniens* grounds where most of the witnesses resided in England and most of the documentary evidence was created and stored in England).

A related factor weighing in favor of litigation in France is defendants' inability to compel critical third-party witnesses to testify in New York and to compel the production of documents from third parties. For example, the individual most directly responsible for plaintiffs' injuries, Volker, cannot be compelled to appear here. Plaintiffs argue that defendants have recourse under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 28 U.S.C. § 1781 note, to compel depositions and document production in foreign countries. However, the evidence defendants would be required to seek through the assistance of foreign courts would be both extensive and critical, coming from the other alleged wrongdoers as well as from the French government's investigation into the accident. The process of obtaining this evidence would be costly and time-consuming. The massive inefficiency and inconvenience that this would create for defendants and plaintiffs is all the more striking given the existence of an alternative forum where many of these problems would not arise.

Against these factors must be weighed the inconvenience to plaintiffs of litigation in France. Plaintiffs argue that because France does not permit contingent fee arrangements, they cannot afford to litigate their case in France. However, the availability of contingent fee arrangements is only one factor to be considered when analyzing the hardships to a plaintiff of conducting litigation in a foreign forum. *See Murray v. British Broadcasting Corp.*, 81 F.3d 287, 292 (2d Cir.1996). Plaintiffs have offered no affidavits or other support for the proposition that they are financially unable to conduct the lawsuit in France. *See, e.g., Ski Train Fire at Kaprun*, 230 F.Supp.2d at 389 (noting that the plaintiffs had filed affidavits demonstrating the financial hardship they would experience if forced to litigate abroad). The mere fact that they are individual, not corporate, litigants does not mean that litigation elsewhere is necessarily a hardship sufficiently arduous to outweigh the other factors in the *Gilbert* analysis.

The *Gilbert* analysis reveals that this litigation has only a tenuous connection to the United States, let alone to New York. Plaintiffs are American citizens, as were the individuals whose deaths gave rise to this suit. France has a significant interest in ensuring the safety of its railways. Defendants would be burdened by their inability to implead other culpable parties as well as by the cost and difficulty of obtain-

ing necessary evidence and transporting it to this district. These problems, as well as the fact that litigation here would be inefficient because of this court's lack of jurisdiction over the Deutsche Bahn defendants, indicates that this action should be dismissed on *forum non conveniens* grounds in favor of litigation in France.

Accordingly, it is unnecessary to reach the Accor defendants' argument that the complaint fails to state a claim against them.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted.

SO ORDERED.